I'd like to reserve two minutes for rebuttal, and I'll watch my time. If it's acceptable to the Court, I'll focus on the suppression issues, because I think that's a critical error in this case. The District Court erred by finding the emergency aid exception met. The 911 call in this case was that someone was outside yelling across the street and threatening someone's life. That is all the officers knew when they walked into the scene. When they arrived, they saw Mr. Guillen standing outside of his home, and he confirmed, yes, I've been yelling outside of my house, letting off steam, completely consistent with the 911 call, that he was just yelling. Well, is that really consistent? If there was more to that call, it said he was yelling and threatening someone's life, not just that he was standing outside letting off steam. Right? Isn't that two different things? It could be. It's unclear because there's no evidentiary hearing on this, but the letting off steam could include yelling threats into the night. That's — there's no indication that there was ever anybody else involved with Mr. Guillen yelling outside. Well, yes, there was, because the caller said he's threatening someone's life. Usually, someone else has to be involved for that. The caller said she heard that, but that she did not hear anybody else and didn't know if anybody else was outside. That could be dead. It was there. But when the officers arrived, Mr. Guillen's the only one that's outside. There's nobody else outside. But isn't that why, don't they wonder at that point? He's outside yelling and threatening someone's life. We better worry about whether someone's dead in the house or about to be dead in the house? No, because the caller — the deputy's report, Deputy Durbin's report at ER 186 states that the subject was standing outside and yelling. Well, the person who was doing the threats, but that doesn't mean we know where the person who was threatening is. Yes, but if the — if the threatening is happening outside, then that would be where the alleged incident is occurring. And when they arrive, they see a stable scene where there's no indication of a fight, a disarray of blood, like in other cases where there was actual blood outside, trail leading into the house. That's the type of evidence that this Court and the United States Supreme Court requires to enter someone's home without a warrant. There's no disarray. There's no indication there was a fight outside. And there's no evidence to indicate there was a fight inside because the call was always about someone standing outside yelling threats into the night. And I understand the Court's concern about death threats. Yes, that could be concerning if there was any other fact to support that there had been a fight outside or something to indicate that it would be inside. But why does the fight have to be outside? I mean, why can't they be worried legitimately that maybe the fight was inside and now he's still yelling outside? Like, I'm going to go back in there and kill him. Why couldn't he be yelling that? That's a threat. And it doesn't mean it's going to happen outside. It could be I'm going to go back in and kill him. That could be what he's yelling. And I would agree that would be a different case because we don't have that being the threat in this case. We have a generalized, a caller reporting generally that he's threatening someone's life. There's no temporal or location connection. What exactly did she say? She stated, we submitted the 911 call. It is on a recording that she gave her address, that she's on the same street. She can hear someone yelling. Can't tell if he's inside or outside. Does not hear anyone else. And he's yelling at the top of his lungs, threatening somebody. At that point, throughout the call, it's a little bit hard to understand some of the what the 911 caller is saying, but that is the gist of what I can understand. The reason I ask you this is where does threatening his life come from? Threatening somebody is what the 911 caller said. But I thought she then said something more than that. The dispatcher, the dispatch receiver then states, so he's threatening someone's life. Do you know? I think that's when she says, do you know if anyone else is there? And she says, no, I don't know if anyone else is there. She didn't say his life. She said threatening somebody. But aren't we talking about what the officers believed? It's not what she says something to the dispatchers. The dispatchers call the officers. The officers are the ones going to the scene, so they're the ones who have the information from the dispatcher, right? They didn't get to talk to the person who made the call. They talked to the dispatcher. So when they're at the scene, they have only gotten the information that the dispatcher has told them, not what the original caller said. We don't know if they listened to the 911 call. The reports don't indicate either way if that recording was sent to the officers or not. We do know, yes, they did not try to go and talk to this woman. She was across the street. They could have confirmed with her what was really going on and obtained more specific facts about the threats. But the only facts we know that they had is what the dispatcher told them, which was the issue. We don't know what the dispatcher told them. We don't have the dispatch. We only have the 911 call interaction with dispatch. We do not have dispatch to the police. I thought you just said that the dispatcher said. You do have the dispatch to the police. And the dispatcher said to the police, she's saying that they're threatening someone's life. So when she dispatched the police, she said threatening someone's life. I apologize, Your Honor. I misspoke. We have the dispatch off the dispatch person speaking to the 911 caller saying, do you hear anyone else when the, I'm sorry. So isn't this at ER 152? At ER 152, it says, can hear a male yelling and screaming and threatening someone's life. That's, I mean, do they type what the person says on the phone? Or you're saying that's their paraphrase of what was said on the phone? This is some kind of, it says detailed history of police event. It looks like a dispatch. I'm not sure what this is exactly. I believe that is the dispatch log on the page before. Mm-hmm. And that seems so. When I listen to the 911 call, I hear her say, the caller say, he's threatening somebody. And then the dispatch caller types in threatening someone's life and repeats that back to 911 call, to the caller. So there's a bit of a dispute on that aspect. Again, no hearing, so we don't know. In terms of the case law, what, your position has to be that there's no case law that, or it doesn't have to be. But, I mean, what is the closest in case that you have either in support, but also that's closest in and found that there was an emergency for Fourth Amendment purposes? The government hasn't identified a case that is comparable here. In every case, the reply at pages 5 and 6 go through the facts of the emergency aid cases addressed by the parties. And all of them have significantly more tangible evidence that would lead to a reasonable belief that someone needs help. Seeing a fracas inside of a house where someone's spitting blood because they were just hit. Responding to a call in Snipe, there was a response to a call of a very hysterical sounding male who screamed, get the police over here now. The responding officer arrives, lives down the street so he knows this area, sees a stranger going in the home and a car he doesn't recognize and all the lights on. So that was enough to get in because that reporting officer confirmed even more additional concerning facts when he showed up on the scene. And I would say that's, I think, the crucial difference in this case. This Hopkins v. Bonvicino, this Court's decision states when the officer's arrived and it's unclear if there's an emergency or if there's questions, they need to take, quote, additional steps to either dispel or confirm or obtain at least a little bit more information. They did. They asked him whether there was somebody in the house. Yes. And he said my roommate's inside sleeping. Right. So they didn't simply, I mean, if he'd said, they didn't just go barging into the house without knowing there was actually another person. They did not. But as Hopkins v. Bonvicino says, that case, this Court offered that additional steps could have been attempting to call the person in the house. You can knock on the door. There's numerous cases where they've looked through the windows and then have confirmed something else, seen some sort of facts that confirmed maybe there was a fight inside or someone is injured because there's blood they can see. Those are really the type of facts that are always present in the cases where this Court affirms emergency aid and where the Supreme Court affirms. We don't have those facts here. So I, the government is asking the Court to stretch the boundaries of the emergency aid exception because there's no case that is comparable to the facts here. Thank you. Thank you. So what go ahead. May it please the Court, Peter Levitt for the United States. What, did the police here have any reason to believe or adequate reason to believe that there was an injured occupant or an occupant who had an imminent injury? Yes, they did. They had an objectively reasonable belief under Mark v. Beard's test. They had a 911 call saying someone's screaming. This is 340 in the morning. Screaming on the porch, threatening somebody's life. Well, they didn't say he was screaming on the porch, actually. The way it was just read, this actually favors you, I think. But either inside or outside. We have a potentially life-threatening threat that has been made and relayed to the responding officers. The responding officers arrive on the scene, and they find defendant who is blowing off steam by screaming, threatening someone's life. He didn't say that. They did not say that he was threatening someone's life when they arrived, right? No, that's correct. But he's the person out there. And they talk to him. They ask him. He gives his answer. They say, is there anybody inside? And he says, yes, my roommate sleeping. The police at that point are in tight ---- They say, did you ---- were you threatening him? Did you hit him? Did you hurt him? Is he okay? Is there anything wrong with your roommate? Those additional prophylactic questions may be ---- may tighten it up even more, Your Honor. But I would respectfully suggest two things. The police in this case, in Hopkins, in Bonnevert, they have to respond to what's in front of them at the moment. This is what they know. And they ask if ---- But there was nothing in front of them that anybody was hurt or that anybody was hurt or that anybody was about to get hurt because this guy was outside. That's correct, Your Honor. But asking if they can go talk to a potential victim is something that police ---- But you're not relying on consent. So asking isn't the point. I understand. Maybe we should have gotten to the consent question and had a hearing and so on. But that's by the boards right now. Correct. We have to assume there was no consent. If there was no consent, the entry ---- the initial entry is still valid as an emergency aid exception because the police are entitled to go in and make contact with the roommate. This is why this is not like the Bonnevert case. I think the judge characterized this as a welfare check, you know, and whether that, you know, makes his finding less adequate, you know, is a question. But that's sort of what you're saying. You're basically saying they were concerned that something could have happened, so they went to check. But the question is, you know, how much ---- is that enough? I would respectfully suggest, yes, Your Honor, because in the Fisher case, it says the police officers don't just walk away because the role of a peace officer, a community caretaker, includes preventing violence and restoring order, not ---- But in Fisher, there were broken windows. There were ---- it was blood. I mean, there was ---- they had concrete reasons to think there was something going on. I would respect ---- Other than a threat. I would respect ---- I guess my question is, is any threat good enough? Says what? Is any ---- as soon as you have a threat, that's good enough reason to go in. No. I think a threat at 340 in the morning, that the threat speaks of, in one way or another, threatening somebody's life. And somebody asks, and the police ask, is there anyone inside? And he says, yes. He's sleeping. This is something police see all the time, Your Honor. And there's somebody who ---- police know that there may well be somebody back there often. It's not a man. The victim has gotten her teeth knocked out and her eye punched and swollen shut, and she's just praying for the cops to come in and help her. And the cops know that if they don't go in and make contact with the person, that that person may die. They don't know this. They don't have trails of blood. They don't have broken windows. They don't have screaming and moaning. But they know from their experience that this is what often happens in this country, when you get called out at 340 in the morning on a threatening somebody's life call. I'm done. Go ahead. Are there any further questions from the Court regarding, I believe, the answering brief covered the other issues. I agree with Defense Counsel that the propriety and constitutionality of the initial entry is the principal inquiry here. But if there are any further questions, I'd be happy to answer them. Do you think there's any concerns about the later, the finding the, the discussion about him roaming around the house and finding the marijuana, bong, do you have any concerns about the search that actually occurred later? No, because that, even if all of that is excised from the subsequently submitted search warrant application, what you're still left with is the victim, Scott, who had been beaten, and they took him away in an ambulance. They had the victim, Scott, saying to Officer, the third one, Durham, I came out and after he beat me, he loaded a shotgun and said, just in case, you want to try your luck. So if, if they, I'm not conceding that it was improvident to walk around with him and see the rod and the marijuana pipe, but even if it was, and even if it's excised, there's still ample probable cause to support the subsequent warrant issued by a detached and neutral magistrate. Thank you. Okay. Thank you. Thank you. Thank you. Your Honors, I'd agree that the, what Judge Berzon highlighted about the district court's order, this welfare check analysis the district court engaged in and the government is asking you to affirm, is a lesser standard than the emergency aid exception. The district court cited, quoted one case about emergency aid at the very end of a long discussion about consent rules, the consent standards of law, but then analyzed the emergency aid exception as basically a general welfare check that you can go into someone's home just to make sure everyone's okay. That's not what the emergency aid exception is. It's very narrow. It's rigorously guarded by this Court. Okay, but isn't this, you don't see the facts any differently here, whether, when you have, it's three something in the morning, he's been outside yelling, the officers come up, he may not at that time be threatening anybody, but I believe the officers indicate he's still highly agitated. They then get from him that there's somebody inside. Whether we go with the idea, I think the officer said he gave consent, but let's assume he didn't give consent. It's your position then they should just walk away with somebody who's highly agitated, three in the morning, there's somebody inside. At this point, they should say, oh, well, we don't see anything, we're going to walk away? Is that what they should have done? No. They should have done what this Court has told them to do in Hopkins v. Bonficino, which is try to make contact with the roommate by knocking on the door, trying to call them, figuring out the roommate's name, maybe go and talk to the 911 caller who's just right across the street and could confirm, maybe provide more details, as this Court would like to know, what were the actual nature of the threats? What was the specific words that this 911 caller was hearing? All of those things are reasonable in law enforcement actions. If the person who was screaming had been inside the house, would that have been different? If we knew that if the 911 caller had said he's screaming at someone in the house. No, when they arrived. If they arrived and they heard somebody screaming from inside the house. I think that yes, that probably would meet the emergency aid exception where this Court. Because essentially there was no protective aspect of this. I mean, there was no need to fear that he was going to continue to do anything. No, Your Honor, and no indication that anything in the house had occurred. I just don't understand that. So if we take as given that someone is threatening someone's life and you think it matters whether they're inside or outside, you think if they're inside threatening someone's life, they can go in. Why aren't we just as concerned if they're outside that there's someone bleeding to death inside? I don't really understand why it matters if the person's inside or outside for our concern that maybe someone is dying in the house. I think because there's no connection between what is concerning is what's happening outside, the screaming outside. That's the concern. Because at that moment, there's no danger to the person in the house. So they're — which leads to the question of whether they can knock or do something. They're not trying to prevent anything else from happening to the person in the house. Well, and I would submit that then you'd have to look at only what the 9-1-1 caller is saying, which is just that someone is outside yelling, so there's still nothing to say. They didn't say that he was outside or inside yelling. I'm sorry? As I understand, what you read is she didn't say he was outside yelling. She said he was inside or outside yelling. She said he was inside or outside, but then the officer's report said we were — we had a report of a subject standing outside and yelling. But apparently that's not what she said. They got it wrong. All right. Anyway, thank you very much. Thank you, Your Honors. United States v. Whelan is submitted, and we will go to Roberts v. Damon Worldwide.
judges: Berzon, Friedland, Cardone